Good afternoon, Your Honor. My name is Laura Cooper. I have the pleasure here of representing Dr. Janes, as well as a group of chronic pain patients who reside within the state of Washington. The primary thing that I would like to convey to the Court is that the decision that we were given by the District Court was essentially a merits decision that was simply collapsed into a standing framework. The state action that the plaintiffs challenged here were two forms of state medical regulation, and the plaintiffs that brought this complaint were precisely within the zone of interest of the statute, which were doctors and patients. It's difficult to understand how somebody who's a doctor would not have direct standing to challenge states' regulation of their medical services. The other two types of standing that the plaintiffs alleged in their complaint to cover both the statutory standing, as well as constitutional standing, were associational standing, as specified in the ADA itself, as well as just tertiary standing, which is a doctrine of the Supreme Court that would The claims that the plaintiffs brought here essentially can be broken down into what we call two categories. The first category would be those claims against the Medical Quality Assurance Commission. The claims that we brought were statutory in nature, and under this Court's authority, the Pecurin case, as well as Cetacean v. Bush, the only relevant factor is whether or not the plaintiffs are within the zone of interest of the statute involved. And here we had doctors and patients. The Court instead dismissed the case based on redressability, which is not even one of the considerations for statutory standing. The redressability might be an issue if it's strictly a constitutional case, but in this case, Congress has already determined redressability by simply creating the statute. So in essence, a dismissal based on redressability is a rejection of the statutory remedy created by Congress itself. The dismissal for the interagency guidelines claims amounts to a dismissal on the merits without ever the plaintiffs having had the opportunity to make their case on the merits. Why is this case ripe, even assuming that there's standing? Why is it ripe for review now, when there really has not been any threat of enforcement of the dosage guidelines? In fact, there has been threat of ripeness has been achieved for sure on the medical quality assurance claims, because the doctor was issued a direct threat, cited by the district court in his opinion, for violations of alleged violations of the professional guidelines. I read it. I thought that had to do with issues other than dosage, issues of patient abuse, or patient monitoring, which were apart from any recommendations. It's not clear what the threats were about, because no charges were ever actually filed. Instead, Dr. James was merely threatened for simply treating patients. The regulations in existence at the time the conduct occurred would have exempted a doctor from any professional complaint based strictly on dosage. So you'd be right that if the medical quality assurance commission had issued a complaint on that basis, they'd be outside the boundary of their statutory authority. But that's not in fact clearly what occurred. On the interagency guidelines, the problem was the plaintiffs were never given an opportunity to show in fact how those guidelines had been utilized as law of the state of Washington. That they had in fact been held up by public health authorities within the state, and given an appearance of authority so that physicians felt compelled to comply with them, even though there was no authority behind them whatsoever. Is Mr. Court judge not dismissed this case after a summary judgment ruling, correct? It was a summary judgment ruling, but it wasn't based on any evidence adduced by the defendants. Was it your position that you weren't obligated to produce anything in response to their motion for summary judgment? No, it's our position that there was nothing to respond to. That there was nothing that they produced that undermined any element of the complaint as pleaded. That the information or facts that they produced did not in fact undermine any substantive element of our cause of action. With respect to the guidelines for just a moment. Yes. That's what I understand them to be, by the way, is it says interagency guidelines. That's the title that they used. It's your contention that under Washington law they have higher authority than just a It's our contention that they have been given an appearance of higher authority. In fact, there's record evidence before your honor, in volume two, pages 26 through 30, there is a form that the Department of Labor and Industries sends out on a regular basis where they cite the interagency guidelines as a basis for demanding record evidence from a doctor justifying dosages that are prescribed for patients that get L&I benefits. So in fact, they are being used as a form of authority within the State of Washington, even though the defendants deny that fact. Well, what, what, as I understand, they were promulgated, or not promulgated, because they're not, they don't go through an APA. Right. They just, they're issued. They were published. Published by this interagency group, is that right? That's right. Now, what's your, what is the evidence that you have that somehow or other they were, they were, they were used to employ some sort of sanction against the doctor or against an individual patient, for example? The Department of Labor and Industries routinely sends out a form to doctors who prescribe opioids for patients that get L&I benefits, demanding based on the supposed Workers, excuse me, but you mean something like workers' comp? Yes, that's correct. Workers' comp agency in the State of Washington is called the Labor and Industries Department. That department issues a form to a doctor on a regular basis every time an opioid is prescribed, demanding based on the authority of the interagency guidelines that certain record evidence be produced to the Department of Labor and Industries. That is the authority that is decided in order to be able to achieve that record demand from the physician. And it happens every time a prescription is written for one of those workers. Is there anything else besides that? Yes. There's at least two other things that I can think of off the top of my head. Excuse me, I need a quick sip here. One is that the interagency medical directors themselves submitted those regulations for republication on several federal websites and in so doing designated them as official guidelines, medical practice guidelines of the State of Washington. So they've been widely circulated in federal republishing sites, and doctors in Washington have now viewed them and seen them as regulations which they must comply with. The dosage limitation within the... Did you produce any affidavits in response to the motion for a summary judgment by doctors that say given the way in which these regulations have been promulgated or published on the basis that we view them as mandatory? Before the decision of the district court was issued, we had no way to know what the factual basis was on which it would render its decision because there was nothing produced by the defendants. You knew what the basis for the motion for summary judgment was? It was standing. But there was no way to know. They were saying no injury in fact, weren't they? So short of proving up our entire claim based on affidavits, there was no way to pick out which fact he was going to rely on because there was nothing produced by the defendants to undermine those claims. There was nothing produced by the defendants to show beyond a dispute of material fact that these in fact were voluntary. It was simply a statement in the record. There was nothing that they can produce now, nothing that they can cite to in their own record that shows that there is a standard. I don't understand why the Bureau of Labor and Industries form has anything. I don't understand how that helps prove your claim. I mean, it's sort of like if I want my teeth cleaned more than every six months, which is the guideline for which Blue Cross wants to pay, they won't pay it, but there's nothing to prevent my dentist from recommending that I come in every three months if I'm willing to pay for it. So why is that? You know, and I have to justify it and the dentist has to justify it. Why does that make it an authority of law just because it's a reimbursement question? It's not a reimbursement question. It's a records-producing demand. It's used by the Department of Labor and Industries to make physicians produce records. They otherwise would not be required to produce. It's a demand. But for what purpose to decide whether to pay the claim? For whatever purpose they would demand the records. The fact that they're using this as a justification for medical records demands makes it an authority under state law for that purpose. I'd like to reserve the remaining of my time for rebuttal, please. Thank you, counsel. Thank you. Good afternoon, and may it please the Court, my name is Melissa Burke-Cain. I'm an Assistant Attorney General representing the State of Washington and the state's officers, employees, and agents who are parties to this action. With me at counsel table today is Michael Tribble, also an Assistant Attorney General. The issue in this case is standing under Article III, Section 2, and standing isn't a technicality of pleading. It's an essential element of Dr. Jayne's case because it's the legal threshold that he must meet for bringing his claims before this court, or any court, any federal court. When the state challenged Dr. Jayne's standing in its summary judgment motion, Civil Rule 56 required Dr. Jayne's to meet that challenge by submitting admissible evidence on the three elements of Article III, Section 2, standing. Dr. Jayne's did not submit the evidence needed to survive summary judgment because he insisted that the allegations in his complaint were enough to meet the burden. After oral argument, and as almost requested by the trial court, Dr. Jayne's did submit a declaration, but that declaration is deficient. It does not show injury. In fact, it's anything other than speculation as to either the agency medical director group guidelines or any activity of the medical commission with regard to Dr. Jayne's. He must also show a causal connection between the injury and the state's activities. In this case, Dr. Jayne's made his own choice and sent a letter to his patient saying that he was no longer going to prescribe opioids in his practice. That is a delinking of the causal connection between any activity by the state and Dr. Jayne's decision. And then the third element of standing, of course, is... If there were a threat, would there still be a delinking? Your Honor, injury, in fact, is an invasion of a legally protected interest. And what Dr. Jayne's is saying is that there was a threat of future action by the medical commission. If what? Presumably a threat to his license to practice medicine. Now, Dr. Jayne's doesn't articulate the invasion of the legally protected interest, and the court doesn't do so in its analysis either. The best we can tell is that the allegation is that there was an improper threat of disciplinary action. But what is the legally protected interest that's being protected there? The legally protected interest is Dr. Jayne's right to a license, but not in a vacuum, within some boundaries. And what attaches if action is taken and discipline is faced as, in fact, which has not occurred, is whether or not he gets the due process protections that any physician gets if they face a licensing action. Or any attorney gets if an attorney faces a licensing action. And in this case, we have to look at both the context of this threat, which was in a settlement meeting that is provided for under the statute for medical discipline. And it's a predisciplinary phase. It's still in the investigative phase when a settlement meeting can occur. And it is an offer. In this case, there was an offer of a settlement. The offer of settlement was a stipulation to informal disposition, which is not a disciplinary action by statute, doesn't require any charges, doesn't require the doctor to admit to any charges. It's a pretty firm stipulation that they were asking, that the state was asking for. Dr. Jayne's assigned a revised stipulation to informal disposition that precludes him. But by the time that that. From prescribing opiates. Yes, Your Honor. But by the time that he had received that, he had already sent his patients a letter saying, I'm not going to be prescribing anymore. So in essence, he had taken himself out of the business of prescribing opioids. But he's back. I understand he's back. He's back prescribing them. I do not know that, Your Honor. And I don't know if we know that from the record. What we do know is that there's never been a statement of charges filed, even though the complaint was received in 2006. There's never been a statement of charges filed. There's never been any action by any state, party, or individual that limits Dr. Jayne's ability to prescribe. It's purely Dr. Jayne's choice at this point, just as he had the choice to decide not to accept the stipulation to informal disposition. But if he had a choice and stopped because of what he perceived to be the state's concerns, and then the state had him sign an agreement that he would not prescribe opiates, is he free now to prescribe the opiates? He is and has been free to prescribe opioids throughout because he made a decision to stop. The state didn't require him to. What did he agree not to do with the state? Nothing. He refused the stipulation to informal disposition back when it was offered in 2008. There's been no other action by the medical commission with respect to him. Because he's not doing it. But you wanted to ask for a stipulation that he would not prescribe opiates. Yes. And he was free to decide not to do that. The next step would be, and this is where the question comes in, as to whether he has a concrete, particularized, actual, imminent, non-hypothetical injury. That's a rightness question more than a standing question, though, because presumably if tomorrow a letter were sent saying, we heard you're prescribing opiates again, and by golly, we think you don't monitor your patients properly, and so on and so forth, then he could go to court. It's really a timing question rather than a standing question, isn't it? Well, I believe that it is a rightness question, but rightness also relates back to the question of injury in fact here, and whether or not there is a sufficiently certain and imminent injury that is facing Dr. Jaynes. And the reason that the state takes the position that there is not is because two things. In the context that the threat was supposedly issued, settlement agreement, settlement offered, represented by counsel, voluntary decision on Dr. Jaynes' part whether to accept or not accept a settlement that was offered. We know that that happened in 2008. We know that there's been no action taken against Dr. Jaynes' license by the commission of any kind. We know that in theory, hypothetically, that could happen. It could happen tomorrow. It can never happen depending on what the commission decides to do. I guess I'm sort of thinking aloud here. If this were a First Amendment claim, which it is not, the rightness issue might be different because there might be a chilling effect. But as I read it, there's not a First Amendment claim with regard to this piece of the case. Am I right on that? That's correct. So the normal rightness issues or analysis would apply. The closest case that I was able to find that gets to the issue you're asking about is actually a Sixth Circuit case against the State Supreme Court of Michigan, and it's in the context of an attorney accused of violating the RPCs, Mr. I believe it's Feger or Feiger. That was a First Amendment case, but it was couched inside the disciplinary action of the bar because it had to do with statements he made impugning the judiciary, which was and is a violation of the RPCs, as we all know. And in that case, he did a preemptive strike, which was essentially a facial challenge to the disciplinary process and to the rules of discipline as to what statements he could make publicly regarding the judiciary. And in that case, it was both standing and rightness, but the court concluded, I believe, and we don't have this in our briefing, but my understanding, and it is a 2009 case, is that there was no standing because the chilling effect has to be reasonable and it has to have a relationship to action being taken. There's no action being taken under the RPCs against that attorney, just like there's no action presently pending against Dr. Jaynes in this case. And I'd like to go to the question of redressability because that's somewhat where the state's position parts ways with the analysis from the court below. And the court below said, as to the medical director's guidelines, no injury in fact, could be no injury in fact, no connection between the guidelines and any injury, and no redressability because what was asked for there is to just take the guidelines off, say there are no more guidelines from the agency medical director's group. And the court was correct in doing that and then took the issue of redressability as to the medical commission and walked through the reasons why there was no redressable injury to Dr. Jaynes. And that really relates back to the question of the injury in fact. What Dr. Jaynes has asked for in the way of relief from this court, and he's asked for it on appeal for the first time as a declaration that the medical commission can take no action against him regarding any opioid practice or any other physician, that any investigation be considered inherently suspect. There's nothing that an agency like the medical commission can do with that kind of request for injunctive relief. And that relates back to the injury in fact, because in this case there were so many things that would have to happen for the speculative aspect of his injury to come to any kind of fruition and there's no certainty whatsoever that he will ever face either charges or sanctions or any effect on his license.  He's managed to short-circuit that opportunity by taking himself away from that and filing this action. There's the opportunity for him to present all of his evidence and respond to the state's evidence if he is in an adjudication. There's full right to appeal. And the standard of proof under Washington law for finding that a physician should be sanctioned is a clear and convincing evidence standard, very high standard to meet. And so there are many protections built in that Dr. Jaynes would have to work through before there really is an injury in this case. So how does all of this relate to the underlying ADA claim? Well, Dr. Jaynes cited a number of cases from another jurisdiction, from California, that are Ninth Circuit cases that talk about architectural barriers. One of the most recent ones, I believe, is the Chapman v. Pier 1 Imports case. But going back to one of the earlier cases in that string of cases, which is, I believe it's the, I'm sorry, I don't remember the name of this case. I've got it written down somewhere. I apologize. It has to do with architectural barriers to a store. And that case states straight out that Article III, Section 2 standing first has to be proven. And you don't get to the ADA claim or any claim on the merits because the focus of the standing issue is not on the merits, it's on the party. Is this the right party? Rightness, is this the right time? Is this the right party to represent the interests of others? That has to all happen before the ADA claims. Now, in that case, in the ADA case and in the Pier 1 Imports case that's, I think, presently pending for decision, what happened there was not whether or not they're standing under the ADA, but whether or not what's the scope of relief that someone who faces architectural barriers can claim? Do they have to actually face that barrier? Can they stay out in the park? So the guidelines here are like the architectural barriers. Is that what the theory is? No, I don't think so. The agency guidelines are really an educational process. And I'd like to refer back to one of the points that counsel made. Educational. Do they tell a doctor that if you don't follow the guidelines you could lose your license? No, not in any way. And they couldn't because they don't have the authority to do that. Well, what do they do? What's the purpose of education, to tell them not to do certain things? No, what it is is an effort to try to raise the level of care and the outcomes. And there's nothing that is required under the guidelines. It's all done in the sense of recommendations. So, for example. It tells you how to be a top doctor instead of a mediocre doctor? No, it says if you have a patient that has chronic pain and they're being treated with opioids at a certain dosage, it's a best practice and a recommendation that we have at the agency medical directors group for you to get a second opinion and have that reviewed and have a case plan that is evaluated. All it does is say these are what we consider to be best practices, but the difference is we have a set of best practices and then we have a regulatory activity by the medical commission that is a minimum floor to what unprofessional conduct is. It's regulation. The medical director's guidelines are simply that, guidelines of what is considered good, solid medical practice. But it has no power, it doesn't have any legal requirements, and no doctor is sanctioned because of it. And one of the things that is interesting is the distinction between the two, both the agency medical directors group and the medical commission. The medical commission has its own rules. It has its own rules for pain management. They are different from the guidelines. And in fact, what they say is no physician will be disciplined based on the dosage of opiates prescribed or the frequency. And so they have imposed their own legal requirements on their own disciplinary system that are quite protective of physicians. Not only would a physician not face discipline unless all of the proof and the clear and convincing evidence and the rest, but they say straight out to physicians, you will not be disciplined based on dosage alone. One of the complaints that Dr. Janes has made is that he's bound by some dosage restrictions. That's simply not the case. So there are no consequences of ignoring or violating all these guidelines. That's correct. No consequences, no consequences legally for the doctors. And I'd like to get back to something that was mentioned earlier, and that has to do with labor and industries and payment in the letter. Actually, the request for records that is referred to in Volume 2, pages 26 through 30 of the excerpts that are in the file, aren't required by the guidelines. They're required by a separate administrative regulation that controls payment by labor and industries, and that's found in 296.20 or 23, and I can't remember which one of the two it is. But what that does is lay out regulations for payment obligation of labor and industries for opioids. The guidelines do not drive what labor and industries does, and does not drive records requests. That's simply an audit function of a third-party payer. Thank you, Counsel. Your Honor, Counsel for the State has just very well demonstrated the primary problem that Dr. James faces. She herself referred to the interagency guidelines as a, quote, best practice. Unfortunately, the best practice that's recognized in the law are the guidelines that were issued by the Medical Quality Assurance Commission. The issuance of the interagency guidelines, which conflict, in fact, irrevocably, with the guidelines that are already in existence from the Medical Quality Assurance Commission, create two impossible, varying standards for doctors to live up according to. The best practices are, in fact, the law that should be recognized and enforced by the State of Washington within the Medical Quality Assurance Commission guidelines, are not the law that the State of Washington is enforcing. The basic problem here is that the law that is being enforced on the ground is not the law that the State of Washington wishes the public, and perhaps even physicians, to believe exists. The law that they themselves publish, which has no authority, and the law which they enforce, which has no authority, is completely separate and imposes different standards on physicians than the laws, in fact, under which they discipline. And a perfect example of that is the citation she just gave you, that doctors will not be disciplined based on dosage, when, in fact, Alan Hunt had his license taken specifically because of dosage. Dr. James has been subject to repeated investigation by the Medical Quality Assurance Commission, even since we filed our complaint. In fact, he was subject to a complaint that was filed as recently as this April, which is very interesting because the State of Washington, we assume in response to this lawsuit, repealed all of its protective pain laws through the legislature this last session. But we just would like this court to help these plaintiffs help the profession so that the law that's enforced on the ground is exactly the law that's constitutionally authorized in the State of Washington. And the Attorney General here herself demonstrates that that's not the case. I'm confused by what you just said. If the statute has been changed, is this whole case moot? No, it's not, because we ask for damages for a class of plaintiffs based on the State's failure to abide by its own law. So there's at least a damages question. We also pleaded substantive due process claims. And, in fact, I'm glad you asked that, because in Washington v. Glucksburg, the only reason that the State of Washington survived the due process challenge that was raised there was because of the protective law of the State of Washington that has now been repealed, which therefore raises a substantive due process challenge, which we included in our complaint. So, no, it has not been mooted. Far from it. Now the damages might have been cut off, but certainly the substantive due process claim is alive. And we may have to amend, we may have to file additional claims, but the Washington v. Glucksburg protective statute no longer exists. That means that right now, in the State of Washington, a doctor has the freedom to prescribe opioids to help a patient kill himself, but not the same freedom to treat chronic pain. That's a big problem. I think that's the end of my time. Thank you, counsel. Thank you. Thank you very much. The case is adjourned. It will be submitted.
judges: Reinhardt, Graber, Paez